UNITED STATES BANKRUPTCY COURT          **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
In re:                                      :
                                            :    Chapter 7
ERIK STEPHEN BROUS a/k/a                     :    Case No. 05-47655 (SMB)
ERIK BROUS,                                  :
                                            :
                          Debtor .          :
----------------------------------------------------X

## MEMORANDUM DECISION REGARDING
## REQUESTS FOR FINAL COMPENSATION
## AND REIMBURSEMENT OF EXPENSES

**A P P E A R A N C E S :**

KITTAY & GERSHFIELD, P.C.
Attorneys for Trustee &
   Applicant Pro Se
100 White Plains Road, 2nd Floor
Tarrytown, New York 10591

          David R. Kittay, Esq.
          Robin Meyer Konigsberg, Esq.
                  Of Counsel


GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC
Special Arbitration Counsel to the Trustee
120 Wall Street
New York, New York 10005

          David A. Gehn, Esq.
                  Of Counsel


KRAMER LEVIN NAFTALIS & FRANKEL LLP
Attorneys for Bear, Stearns & Co., Inc.
1177 Avenue of the Americas
New York, New York 10036

          P. Bradley O'Neill, Esq.
                  Of Counsel

DIANA G. ADAMS
Acting United States Trustee
33 Whitehall Street
New York, New York 10004

    Andrew Velez-Rivera, Esq.
       Of Counsel


**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

      Three fee applicants seek final compensation in this chapter 7 case. They include

(1) David L. Kittay, the chapter 7 Trustee, (2) Kittay & Gershfeld, P.C. (the "Kittay

Firm"), the Trustee's general counsel, and (3) Gusrae, Kaplan, Bruno & Nusbaum PLLC

("Special Arbitration Counsel"), the Trustee's special litigation counsel. Bear, Stearns &

Co., Inc. ("Bear Stearns"), the main creditor, filed an objection to each application. (See

Bear Stearns' Objection to the Final Fee Applications of (i) David R. Kittay, Chapter 7

Trustee; (ii) Kittay & Gershfeld, P.C.; and (iii) Gusrae, Kaplan, Bruno & Nusbaum PLLC

dated March 20, 2007 ("Objection")(ECF Doc. # 56.))


      The principal legal issue concerns the proper method of computing the Trustee's

commission. The Trustee seeks the maximum commission allowable under 11 U.S.C. §

326, which is based upon the amounts that have been disbursed in the case. The Court

concludes, however, that the use of § 326 is not appropriate, except as a limit, and that

the Trustee, like other professionals, must generally establish his right to compensation

under the "lodestar" method incorporated into 11 U.S.C § 330.

## BACKGROUND

The debtor filed this chapter 7 case on October 15, 2005.[1]  His schedules

identified three main assets that the Trustee would have to administer.  First, the debtor

owned a condominium apartment located at 530 East 76th Street (the "Apartment").  He

valued the Apartment at $1.1 million, and indicated that it was encumbered by a

mortgage in the sum of $932,487.61.[2]  Second, he asserted a right to $86,000 in the

possession of Bear Stearns, his former employer, but Bear Stearns disputed his claim.

Third, he listed an unliquidated claim against Bear Stearns arising from the termination of

his employment.  This last matter, and a Bear Stearns counterclaim in excess of $2

million, were the subject of an arbitration pending before the National Association of

Securities Dealers, Inc. ("NASD").[3]

### A.    The Apartment

Although the debtor had valued the Apartment at $1.1 million, G.E.M. Auction

Corp. ("GEM"), the Trustee's real estate broker, thought it was worth between $1.45

million and $1.55 million.  GMAC, however, became a thorn in the Trustee's side.

Shortly after the commencement of the case, it filed a motion for relief from the

automatic stay to foreclose its lien.  The Trustee and GMAC explored the mutually

beneficial alternative of a bankruptcy sale, and GMAC withdrew its motion.  GMAC

refused, however, despite the Trustee's urging, to "carve out" any amount from its share

---

[1]      The filing occurred two days before the Bankruptcy Abuse Prevention & Consumer Protection Act
became fully effective.  The statutory references refer to the statute in effect on the filing date.

[2]      According to Schedule D, the secured debt consisted of a home equity line of credit ($225,000)
and a mortgage on the Apartment ($707,487.61).  Both loans were held by affiliates of GMAC, and are
collectively referred to as the "mortgage".

[3]      The debtor also scheduled a another pending arbitration, involving an unliquidated claim, against
Lehman Brothers.  The Trustee did not administer this property, and eventually abandoned it.

of the proceeds to cover the estate's administrative costs or create a fund for unsecured creditors.

Given the amount of equity, a sale still made sense even without the "carve out." The Trustee marketed the Apartment through GEM, and procured a buyer who agreed to pay $1.4 million. The sale was subject to higher and better offers, and a bankruptcy auction ensued. Another person bid $1.47 million and won the auction. According to the Trustee, GMAC failed or refused to promptly provide a "pay-off" letter, delaying if not threatening the closing. The Trustee filed an application to fix the amount of GMAC's lien, but after GMAC produced a "pay-off" letter, the Trustee withdrew his application.

The sale of the Apartment closed on or about July 16, 2006. The Trustee's Final Report (Exhibit C) does not reflect the receipt of $1.47 million. Instead, it appears that the buyer paid GMAC (or North Fork)[4] $997,092.22 at the closing to satisfy the two mortgages. (Trustee's Response, at ¶ 16 n.3.) It also appears that the buyer paid accrued condominium charges totaling $39,769.71. (Id.) After deducting the secured debt, the sale netted $433,138.07. The Trustee also paid the debtor his $50,000 homestead exemption. Thus, the actual benefit to the unsecured creditors was approximately $383,000, and this was before payment of GEM's real estate commission of $88,200.

### B.    Bear Stearns

At the time that the debtor was discharged from employment with Bear Stearns, he owed the firm approximately $2,250,000 on account of an unpaid loan. The debtor

---

[4]    North Fork Bank apparently succeeded to GMAC's rights. (See Trustee's Response To Bear Stearns' Objection to the Final Fee Applications of (i) David R. Kittay, Chapter 7 Trustee; (ii) Kittay & Gershfeld, P.C.; and (iii) Gusrae, Kaplan, Bruno & Nusbaum PLLC, dated Apr. 6, 2007, at ¶ 16 n.3)("Trustee's Response")(ECF Doc. # 60.)

maintained a brokerage account with Bear Stearns, worth about $86,000, but Bear

Stearns contended that these funds secured the unpaid debt.  Prior to the bankruptcy, the

debtor had commenced an arbitration against Bear Stearns for improperly discharging

him and using improper language in the debtor's Form U-5.[5]  Bear Stearns

counterclaimed to recover the unpaid loan.

The Trustee investigated the claims, and as a result of that investigation, retained

Special Arbitration Counsel, the debtor's pre-petition lawyer, to prosecute the arbitration

and defend against the counterclaim.[6]  Following discovery and just three weeks before

trial, Bear Stearns made a settlement proposal.  It offered to reduce its secured claim by

33% to $1,577,133.30, and keep the funds in the brokerage account.  The Trustee

accepted the offer because he thought that the debtor was likely to lose the arbitration,

and the settlement would reduce Bear Stearns' share of the unsecured debt from 85% to

78%.  The Court "so ordered" the Stipulation and Order Between Bear, Stearns & Co.,

Inc. and Chapter 7 Trustee on September 22, 2006.  (See ECF Doc. # 44.)

## C.      The Trustee's Other Duties

In addition to the foregoing, the Trustee conducted an investigation relating to

discrepancies in the debtor's disclosures.  The debtor had earned over $500,000 each year

for the prior seven years, and had earned over $1 million per year for two of those years.

---

[5]      The information regarding the arbitration was culled from the Trustee's application to retain
Special Counsel. (See Application for Authority to Retain Gusrae, Kaplan, Bruno & Nusbaum PLLC as
Special Counsel to the Trustee Effective February 23, 2006, dated Feb. 28, 2006 (ECF Doc. # 22).)

[6]      The debtor had filed an earlier chapter 11 that was dismissed by order dated October 6, 2005.  (See
Order Dismissing Chapter 11 Case, dated Oct. 6, 2005)(ECF Doc. # 108, filed in Case No. 04-13687.)  The
dismissal order provided that in the event that the debtor filed another bankruptcy case, the automatic stay
would not apply to the counterclaim asserted in the arbitration.  The debtor filed this chapter 7 case nine
days later.

The Trustee applied for the right to conduct an examination of the debtor pursuant to Federal Bankruptcy Rule 2004, and the debtor opposed the application.  As a result of litigation over the proposed order the Trustee was able to obtain the documents he needed, he concluded that the debtor had not concealed assets, and he decided not to object to the debtor's discharge.

The Trustee also reviewed several claims.  The debtor's ex-spouse filed a priority claim in the amount of $113,645.  The Trustee examined the claim, and determined not to object to it.   In addition, the Trustee also convinced three creditors who had filed claims after the bar date to voluntarily subordinate those claims, the result mandated by 11 U.S.C. § 726(a)(3).

**D.     The Fee Applications**

According to the Trustee's Final Report the net cash available for distribution is $392,139.51.  The Court received six applications for compensation that are summarized in the following table:

| Applicant | Compensation Requested | Expenses | Hours |
|---|---|---|---|
| David R. Kittay<br>Chapter 7 Trustee | 64,415.21 | | 13.4 |
| Kittay & Gershfeld, P.C.<br>Attorney for the Chapter 7 Trustee | 70,746.75 | 1,284.83 | 212.95 |
| G.E.M. Auction Corp.<br>Real Estate Broker for Chapter 7 Trustee | 88,200.00 | 0 | |
| Gusrae, Kaplan, Bruno & Nussbaum PLLC<br>Special Arbitration Counsel for the Chapter 7 Trustee | 13,097.50 | 165.90 | 53.70 |
| Kavanaugh Maloney & Osnato, LLP<br>Special Real Estate Counsel for Chapter 7 Trustee | 10,156.25 | 476.75 | 31.25 |
| Gary R. Lampert<br>Accountant for the Chapter 7 Trustee | 9,758.00 | 0 | 32.20 |
| **Totals** | **256,373.71** | **1,927.48** | |

If all of the requested fees and expenses are allowed and paid, $133,838.32 will remain available for distribution. Priority claims total $113,645, leaving approximately $20,000 to distribute to $2 million of unsecured debt, or an approximate dividend of only 1%.

As noted, Bear Stearns objected to three of the fee applications, and the other three have been allowed and paid. Bear Stearns contends that the Trustee failed to sustain his burden of proof. He applied for the statutory maximum fee, but did not prove the reasonableness of the fee. Bear Stearns also objected, in part, under the mistaken belief that the Trustee had not submitted any time records. While the Trustee did submit time records, the error does not affect the objection. The Trustee (and other lawyers and

paralegals at his firm) only recorded $4,135.50 in billable time devoted to Trustee duties. The billing records do not, therefore, support an application for over $64,000.

Turning its attention to the Kittay Firm, Bear Stearns argued that the work billed on the arbitration provided little benefit to the estate. In addition, too many lawyers at the firm participated in internal meetings, and their arbitration-related work duplicated the services of Special Arbitration Counsel. In a similar vein, Bear Stearns too many lawyers participated in meetings relating to the real estate-related matters, and the Kittay Firm duplicated the services provided by Kavanaugh Maloney & Osnato, LLP ("Special Real Estate Counsel"). Bear Stearns also complained that the Trustee and other professionals sometimes performed trustee work that they billed as legal services.

Finally, Bear Stearns objected to the fees sought by Special Arbitration Counsel. These fees were out of proportion to any benefit that the services conferred on the estate. Furthermore, Special Arbitration Counsel requested a fee of $350 for services rendered on January 20, 2006, prior to its retention.

## DISCUSSION

### A.     The Trustee's Commission

#### 1.     Introduction

Two provisions of the Bankruptcy Code affect the Trustee's compensation. First, 11 U.S.C. § 326(a) fixes the Trustee's <u>maximum</u> compensation, according to a sliding scale, based upon "moneys disbursed or turned over." The subparagraph states:

> In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of

8

$5,000 but not in excess of $50,000, 5 percent on any amount in excess of
$50,000 but not in excess of $1,000,000, and reasonable compensation not
to exceed 3 percent of such moneys in excess of $1,000,000, upon all
moneys disbursed or turned over in the case by the trustee to parties in
interest, excluding the debtor, but including holders of secured claims.

The Trustee computed his maximum commission, based on § 326(a), in the sum
of $64,432.11, but he is seeking $64,415.21.

By its terms, § 326(a) sets a maximum limit, but does not create right to or
standard for awarding compensation.  United States Trustee v. Cain (In re Lan Assocs.
XI, L.P.), 192 F.3d 109, 115-16 (3d Cir. 1999); see Connolly v. Harris Trust Co. of
California (In re MiniScribe Corp.), 309 F.3d 1234, 1241 (10th Cir. 2002).  Instead, it
permits the Court to allow "reasonable compensation under section 330," the same
provision that governs the compensation of attorneys and other professionals.
Accordingly, the court must begin by assessing the reasonableness of the trustee's
compensation under § 330 before applying the § 326(a) cap.  In re MiniScribe, 309 F.3d
at 1241; In re Ohio Industries, Inc., 299 B.R. 853, 857 (Bankr. N.D. Ohio 2003); In re
Butts, 281 B.R. 176, 179 (Bankr. W.D.N.Y. 2002).

Bankruptcy Code § 330 authorizes the court to award reasonable compensation to
the applicant based on the actual, necessary services, and to reimburse him for his actual,
necessary expenses.  11 U.S.C. § 330(a)(1).  Section 330(a)(3)(A) establishes the relevant
criteria:

> In determining the amount of reasonable compensation to be
> awarded, the court shall consider the nature, the extent, and the value of
> such services, taking into account all relevant factors, including —
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;

9

      (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

      (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

      (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[7]

The fee applicant bears the burden of proof on his claim for compensation. Howard & Zukin Capital v. High River Ltd. P'ship, No. 05 Civ. 5726 (BSJ), 2007 WL 1217268, at *2 (S.D.N.Y. Apr. 24, 2007); Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.), 210 B.R. 19, 24 (B.A.P. 2d Cir. 1997); In re Keene Corp., 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997). Even in the absence of an objection, the Court has an independent duty to scrutinize the fee request. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 841 (3d Cir. 1994). The applicant must submit contemporaneous time records, although a computerized printout summary, in lieu of the original time slips, will suffice. Masterwear Corp. v. Angel & Frankel, P.C. (In re Masterwear Corp.), 233 B.R. 266, 278 & n. 14 (Bankr. S.D.N.Y. 1999). The standards for time records are contained in this Court's Fee Guidelines, as amended, and the guidelines issued by the Executive Office of United States Trustees. See 28 C.F.R., pt. 58, App. A (2007) ("UST Guidelines").[8]

---

[7]     The criteria are also stated in the negative. The Code expressly proscribes compensation for services that are unnecessarily duplicative, not reasonably likely to benefit the estate or unnecessary for the administration of the case. 11 U.S.C. § 330(a)(4)(A).

[8]     The Court's Administrative Order (re: Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases), dated April 19, 1995, at ¶ A, implicitly

Generally, fee applications, standing alone, must contain sufficient detail to demonstrate compliance with § 330. UST Guidelines, (b). Any uncertainties due to poor record keeping are resolved against the applicant. In re Poseidon Pools of America, 216 B.R. 98, 100-101 (E.D.N.Y. 1997). Time records must be broken down by project. Id.,(b)(4)(i). Entries concerning communications (e.g., telephone calls, letters) should identify the parties and the nature of the communication. Id., (b)(4)(v). Entries relating to conferences or hearings should identify the subject of the hearing, and explain, where appropriate, why more than one professional from the applicant participated. Id. Finally, multiple project services rendered on the same day should be listed in separate entries unless the aggregate daily time does not exceed one half hour. Id. Alternatively, and consistent with the practice followed here prior to the adoption of the UST Guidelines, the applicant may "lump" his daily project entries provided he indicates parenthetically the amount of time spent on each activity.

It must be borne in mind that a Court does not determine "reasonableness" through hindsight. 3 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 330.04[1][b][iii], at 330-31, (15th ed. rev. 2006). A decision reasonable at first may turn out wrong in the end. The test is an objective one, and considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances." In re Ames Dep't Stores, Inc., 76 F.3d 66, 72 (2d Cir.1996) (citing In re Taxman Clothing Co., 49 F.3d 310, 315 (7th Cir.1995) (Posner, C.J.)); accord In re Angelika Films 57th, Inc.,

---

adopted the UST Guidelines for all fee applications filed on or after May 1, 1995 in post-1994 Reform Act cases.

227 B.R. 29, 42 (Bankr. S.D.N.Y.1998); In re Keene Corp., 205 B.R. at 696; In re Drexel

Burnham Lambert Group, Inc., 133 B.R. 13, 23 (Bankr. S.D.N.Y.1991).

    **2.**    **The "Lodestar" Approach**

The customary way to determine a reasonable fee is to begin with the "lodestar"

test, and then decide whether to apply any appropriate enhancements under Johnson v.

Georgia Highway Express, Inc., 488 F.2d 714, 717-720 (5th Cir.1974). In re MiniScribe,

309 F.3d at 1243. The "lodestar" approach involves multiplying the reasonable billing

rate by the reasonable number of hours expended. See Blum v. Stenson, 465 U.S. 886,

898-901 (1984). The "lodestar" includes "most, if not all" of the factors relevant to

determining a reasonable fee. Pennsylvania v. Delaware Valley Citizens' Council for

Clean Air, 478 U.S. 546, 566 (1986); see Blum, 465 U.S. at 898-901 (the "lodestar"

incorporates most of the Johnson factors); Hensley v. Eckerhart, 461 U.S. 424, 434 n.9

(1983)("many of these [Johnson] factors usually are subsumed within the initial

calculation of hours reasonably expended at a reasonable hourly rate"). Thus, the

"lodestar" already reflects the novelty and complexity of the matter, Blum, 465 U.S. at

898-99, the quality of the representation and the results achieved, id. at 899 (an upward

adjustment may be justified "only in the rare case where the fee applicant offers specific

evidence to show that the quality of service rendered was superior to that one reasonably

should expect in light of the hourly rates charged and that the success was

'exceptional'"), and the contingent risk of non-payment. City of Burlington v. Dague,

505 U.S. 557, 567 (1992) ("[W]e hold that enhancement for contingency is not permitted

under the fee-shifting statutes at issue."); In re MiniScribe, 309 F.3d 1246-47(Hartz, J.

concurring)(applying Dague's rationale to a trustee's application for compensation).

12

Enhancements to the "lodestar" amount are proper only in rare and exceptional cases supported by specific evidence and detailed findings. Delaware Valley Citizens' Council for Clean Air, 478 U.S. at 565; see Blum, 465 U.S. at 901. "The party advocating such a departure bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." Grant v. Bethlehem Steel Corp., 973 F.2d 96, 101 (2d Cir. 1992); accord United States Football League v. Nat'l Football League, 887 F.2d 408, 413 (2d Cir. 1989), cert. denied, 493 U.S. 1071 (1990).

Although nothing more need be said to justify the use of the "lodestar" test, certain issues unique to bankruptcy bolster the need to use it. First, the knee-jerk allowance of the maximum commission under § 326(a) can lead to a windfall. There are cases in which the "moneys disbursed" are disproportionate to the services performed. For example, a trustee may "inherit" a substantial bank account, and have nothing more to liquidate. That trustee will perform fewer services than the trustee appointed to represent a "no-asset" estate, who then proceeds to create an estate through litigation recoveries. If the trustee's compensation is keyed solely to the amount he or she disburses, rather than the reasonable and necessary services required by the case, the panel trustee program will become a lottery.

Second, the application of the "lodestar" resolves a practical problem in a case like this one. The line between trustee work, which is covered by the commission, and legal work, which is covered by the fee, is often hard to draw. In re Lehal Realty Assocs., 112 B.R. 590, 591-592 (Bankr. S.D.N.Y. 1990). Where the trustee retains counsel, and particularly where the trustee retains his own law firm as counsel, some of the trustee's ministerial duties invariably get billed as legal services. If the trustee

13

receives a bonus in the form of a maximum commission, and his firm receives a legal fee, the legal fees attributable to those trustee services represent an overpayment, and in essence, double compensation.  On the other hand, if the trustee's compensation is based on the "lodestar," and the court applies the same billing rate to the trustee and legal services, the spill over of trustee work into his firm's fee application is irrelevant to the aggregate award.

###   3.    The Trustee's "Lodestar"

The Trustee's time records reflect that he (or other lawyers or paralegals in his firm) spent 13.40 hours performing trustee functions up to the time that he filed his final report.[9]  Based upon the billing rates of the Trustee and the other professionals and paraprofessionals in his firm, this would have accounted for a fee of $4,135.50.  After he filed his final report, the Trustee (or other lawyers or paralegals in his firm) billed an additional $14,837.90 in Trustee time.  The billing rates are consistent with attorneys in this area performing comparable services at comparably sized firms,[10] and all of the services leading up to the final report were reasonable and necessary.

Many of the post-final report services, however, appear to be legal in nature, and relate to the defense of the Trustee's (and the Kittay Firm's) fee application in light of the Bear Stearns objection.  Attached as Schedule A are those time entries culled from the Trustee's time records that relate to the fee objection.  The time-value of these services

---

[9]    Just as a trustee sometimes performs (and bills for) legal work, some of the tasks typically associated with a trustee's duties are actually performed by others, such as the trustee's law partners or employees.  In this case, six individuals, including the Trustee, billed their time to trustee work.

[10]    This implicitly accepts the proposition that the same billing rates should apply to the Trustee's legal and non-legal/trustee services.  While this may not always be appropriate, no one has argued otherwise in this case or suggested a different rule.

totaled $11,225.75.  I conclude that these fees, whether for legal or trustee services, should not be allowed.

While the cost of preparing a fee application is compensable, the cost of defending one may not be.  The Bankruptcy Code expressly covers the former.  See 11 U.S.C. § 330(a)(6)("Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application."). Moreover, the professional must prepare and submit an application in order to get paid. Boldt v. Crake (In re Riverside-Linden Inv. Co.), 945 F.2d 320, 323 (9th Cir. 1991). There is no parallel statutory requirement to defend against an objection to a fee application, or to receive compensation for the legal fees incurred in that defense. Furthermore, fee litigants, like other litigants, must generally bear their own legal expenses under the "American Rule."  In re St. Rita's Assocs. Private Placement, L.P., 260 B.R. 650, 652 (Bankr. W.D.N.Y. 2001); In re DN Assocs., 165 B.R. 344, 349-50 (Bankr. D. Me. 1994); see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975) ("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.")

Nevertheless, some courts have awarded the litigation fees and expenses incurred by the successful applicant out of fear that the failure to do so would dilute the fee award, and encourage parties to file frivolous objections.  E.g., Smith v. Edwards & Hale, Ltd. (In re Smith), 317 F.3d 918, 929 (9th Cir. 2002); Hennigan Bennett & Dorman LLP v. Goldin Assocs. (In re Worldwide Direct Inc.), 334 B.R. 108, 111 (D. Del. 2005); In re Ahead Commc'ns Sys., Inc., No. 02-30574, 2006 WL 2711752, at *5 (Bankr. D. Conn. Sept. 21, 2006).  Conversely, other courts have declined to award the fees where the

objection was filed in good faith and the objecting party prevailed.  In re Teraforce Tech.
Corp., 347 B.R. 838, 867 (Bankr. N.D. Tex. 2006); In re St. Rita's Assocs. Private
Placement, L.P., 260 B.R. at 652.  At least one court has expressed the concern that
allowing the losing applicant to recover its legal fees would encourage meritless fee
requests because the applicant could earn more fees opposing objections to its frivolous
request.  See In re Riverside-Linden Inv. Co., 945 F.2d at 323.

In the present case, the Trustee failed to justify a departure from the "American
Rule."  He relied on § 326 to support his fee, and ignored § 330.  Bear Stearns asserted a
good faith objection to the Trustee's and the two other requests, and has substantially
prevailed.  Finally, the Trustee's defense of his and the other fee applications were
neither reasonable nor necessary from the standpoint of the other creditors, and plainly
failed to provide them with any benefit.

Accordingly, I conclude that $11,225.75 of the post-final report fees should be
disallowed, or more accurately, borne by the Trustee and the Kittay Firm instead of the
creditors.  The balance of the post-final report fees in the amount of $3,612.15 was
reasonably and necessarily incurred in completing the administration of the estate.  Thus,
the Trustee demonstrated under the "lodestar" method that his reasonable and necessary
fees totaled $7,747.65.

### 4.    Enhancing the "Lodestar"

The final question is whether the Trustee, who is seeking a fee in excess of
$64,000, is entitled to a fee enhancement or Johnson multiplier of approximately 8.3.
Thus posed, the question answers itself.

16

The Trustee failed to sustain his burden of proving that he is entitled to an enhancement of his compensation in this or any other amount. The entire estate was generated from the sale of a single piece of property. The sale was consistent with a trustee's duty to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(a)(1). There was nothing exceptional about the sale; the debtor undervalued the Apartment in his schedules, and the Trustee sold it at the low end of what GEM said it was worth. To the extent that the Trustee spent time marketing the Apartment, or attempting to get a "carve-out" or pay-off letter from GMAC, his services were reflected in the "lodestar" calculation. Similarly, neither the work done by the Trustee in connection with the arbitration, or the result achieved, were rare or exceptional.

This is not a criticism of the Trustee or his performance. He did what he could with the hand he was dealt. The point is that he has failed to demonstrate, as he must, that this is the rare case that calls for an enhancement of the "lodestar."

## B.    Kittay & Gershfeld, P.C. (The Kittay Firm)

The Trustee retained his own law firm to serve as his general bankruptcy counsel. The Kittay Firm seeks aggregate fees in the sum of $70,746.75. The rules for calculating the "lodestar," discussed above, apply to this application as well. The Court has already concluded that the billing rates used by the Firm's shareholders and employees were reasonable. Consequently, I turn to the reasonableness of the services billed to the estate.

1.        **The Duplication of Services**

a.        **Real Estate**

Bear Stearns argues that the Kittay Firm duplicated the services provided by the

two Special Counsels.  I agree, although not to the degree that Bear Stearns contends.

Special Real Estate Counsel was retained by order dated May 9, 2006, <u>nunc pro tunc</u> to

February 14, 2006, to represent the estate in connection with the sale of the Apartment.

The sale closed on July 16, 2006.  Special Real Estate Counsel negotiated and prepared

two sale contracts, prepared the necessary documents for and attended the closing, and

secured the balance of the sale proceeds for the estate.  (See <u>Final Application of</u>

<u>Kavanagh Maloney & Osnato, LLP for Allowance of Compensation and Reimbursement</u>

<u>of Expenses</u>, dated Sept. 22, 2006, at ¶ 3)(ECF Doc. # 52**.**)  It billed a total of $10,156.25

for these services, the fees were allowed without objection, and were presumably paid.

The Kittay Firm's time records reflect that it also billed for legal services directly

related to the sale or closing documents, and an attorney from the Kittay Firm attended

the closing along with Special Real Estate Counsel.  The fees attributable to these

services, which are set forth in Schedule B, totaled $7,597.53.[11]

For the most part, these services were duplicative of those provided by Special

Real Estate Counsel, and were therefore unnecessary.  The estate did not require two sets

of lawyers overseeing this transaction.  In addition, some of the entries refer to "attention

to contract and closing issues," "attention to closing issues," and similar "attention"

---

[11]        Schedule B does not include the services pertaining to the GMAC pay-off letter dispute.  A pay-off letter is typically required at the closing, and hence, should have been the sole concern of Special Real Estate Counsel.   Here, however, GMAC's delay in issuing the pay-off letter led to litigation, which was appropriately handled by the Kittay Firm.

services.  They are too vague, and do not identify what the professional did.  The fees

pertaining to these duplicative (and sometimes vaguely described) services will be

disallowed, subject to two exceptions.

First, Mr. Kittay's services, which accounted for billed time of $668.28, will be

allowed.  Mr. Kittay was also the Trustee, and had to be kept informed about the progress

of the sale.  From the description, these services could just as easily have been classified

and billed as trustee work.  In that event, they would have been included in the Trustee's

"lodestar," and allowed as part of his commission.  Since the same billing rates applied to

Mr. Kittay's trustee and legal services, the misclassification is harmless, and his services

reflected on Schedule B will be allowed.  Second, the Kittay Firm had to coordinate to

some degree with Special Real Estate Counsel.  Combining these two exceptions, the

Court will allow $1,500.00 of the services on Schedule B, and disallow the remaining

$6,097.53.

The balance of Bear Stearns' challenge to the real estate services lacks merit.  The

Kittay Firm defended against GMAC's relief from stay motion, and attempted to obtain a

§ 506(c) waiver or "carve out" from GMAC for the estate.  It provided reasonable

services in opposing stay relief since the foreclosure and forced sale of the Apartment

could have wiped out all of the estate's equity.  The opposition to GMAC's motion

contributed to the bankruptcy sale and the equity realized by the estate.

The Kittay Firm also properly sought a § 506(c) waiver from GMAC.  The theory

of the waiver is that GMAC, the secured creditor, would benefit directly from the

bankruptcy sale, and should, therefore, absorb some of the administrative costs relating to

the sale.  Such consensual waivers or "carve outs" are commonplace, and it was

appropriate for the Trustee to ask for one.  The fact that he failed to obtain the waiver

does not mean that the Kittay Firm's efforts were unreasonable or unnecessary at the time

they were rendered.  Finally, although Special Real Estate Counsel's May 2006 retention

was retroactive to February 14, 2006, the Kittay Firm still had to bear the laboring oar on

the real estate transaction until Special Real Estate Counsel was actually retained.

### b.   The Arbitration

Bear Stearns contends that the Kittay Firm's services relating to the arbitration

duplicated those of Special Arbitration Counsel, and given the outcome, provided little

benefit to the estate.  The Kittay Firm billed $12,008 to these issues.  Special Arbitration

Counsel also billed $13,097.50, although its fee request is the subject of a Bear Stearns'

objection.  Under the settlement, Bear Stearns did not pay anything to the estate, and

reduced its claim by approximately $790,000.  In light of the 1% distribution, the

reduction freed up less than $8,000 for distribution to the other unsecured creditors.

Although the outcome was disappointing, the services were nonetheless

reasonable at the time that they were rendered.  The debtor held two affirmative claims

against Bear Stearns, and was also defending against a counterclaim in excess of $2

million.  The main affirmative claim sought damages in an unliquidated amount based on

allegedly defamatory statements in the Form U-5 issued by Bear Stearns when it

terminated the debtor's employment.  At the time that the Trustee decided to pursue the

arbitration, the law regarding the viability of such claims was unsettled.  Some courts had

ruled that the statements in a Form U-5 were absolutely privileged, while others had

20

concluded that the statements were only protected by a qualified privilege that could be
pierced by proof of malice.

On June 28, 2006, the United States Court of Appeals for the Second Circuit
concluded that this represented an "unsettled" and "important" question of New York
law, and certified the question to the New York State Court of Appeals.  Rosenberg v.
Metlife, Inc., 453 F.3d 122, 128 (2d Cir. 2006).  In late March 2007, New York's highest
court concluded, with two judges dissenting, that the statements were absolutely
privileged.  Rosenberg v. Metlife, Inc., 866 N.E.2d 439 (N.Y. 2007).  Given the unsettled
nature of the legal viability of the defamation claim, the decision to pursue it was a
reasonable one.

Furthermore, and except as noted, the amount of time devoted to the task was
reasonable and not duplicative.  The Kittay Firm billed $5,494.50 prior to February 23,
2006, the effective date of Special Arbitration Counsel's retention.  These services
generally related to investigating the claims and the arbitration.  These services obviously
did not duplicate the services of Special Arbitration Counsel.

The Kittay Firm billed another $2,669.75 after the retention date, but before the
Court signed the nunc pro tunc retention order.  Here, there was overlap, but it could not
be helped.  The Kittay Firm was still the only lawyer actually retained during this period
to represent the estate.

The balance of $3,843.75 was billed after March 28, 2006, the date that Special
Arbitration Counsel's retention order was actually signed.  The majority of the services
after that date were devoted to consideration of the proposed settlement.  The settlement

implicated issues of bankruptcy law, and ultimately required approval by this Court under

Federal Bankruptcy Rule 9019.  Hence, the services were reasonable and necessary.

### 2.       Other Objections

#### a.       Real Estate

Bear Stearns also complained that the Kittay Firm conducted too many internal

conferences regarding the real estate sale, and its objection identified 19 separate multi-

lawyer conferences.  (Objection, at ¶ 26.)  One objection was a mistake, as the time

records did not reflect any meetings on May 28, 2006, a Sunday.  Twelve of the 18

remaining conferences involved two lawyers.  (2/7, 2/10, 3/1, 3/3, 3/15, 4/3, 4/12, 4/25,

5/4, 7/6, 7/17 and 7/24.)  Eight of these involved the Trustee and another lawyer in his

firm.  (2/7, 2/10, 3/1, 3/3, 3/15, 4/12, 4/25 and 7/17.)  These conferences typically lasted

between six and twelve minutes.  In light of the length of these "conferences," and for the

reasons stated above, these brief meetings reflect instances in which the Trustee's counsel

reported to its client about some matter or issue in the case.  I do not view these

conferences as unreasonably duplicative services, or "padding."

Four of the two-lawyer meetings did not include the Trustee.  (4/3, 5/4, 7/6 and

7/24.)  The time billed to the July 6th conference has already been reduced by

approximately 80% because it duplicated the services of Special Real Estate Counsel.  No

further reduction is required.  The total fee attributable to the remaining three conferences

was only $332.50.  Sometimes, two lawyers in the same firm must discuss matters.

Given the de minimis amount involved, these fees will be allowed.

Lastly, the remaining six conferences involved three lawyers. (2/27, 3/27, 4/5, 5/16, 6/22 and 6/27.) The time charges pertaining to the June 22nd conference have already been reduced by approximately 80% because it duplicated the services of Special Real Estate Counsel. No further reduction is required. The aggregate time charges for the remaining conferences were $1,362. The Kittay Firm has failed to justify the need or the participation of three lawyers at these internal conferences. One third of $1,362, or $454, will be disallowed.

**b.     Arbitration**

Bear Stearns also objected on the ground that the time records relating to the arbitration reflected "numerous duplicative internal meetings" on 1/6, 1/11, 1/17, 1/20, 2/22, 2/27, 3/8, 4/18, 5/30, 6/22 and 6/28. (<u>Objection</u>, at ¶ 24.) The meetings on 1/11 (.3 hrs.), 1/17 (.1 hrs.), 2/27 (.2 hrs.), 3/8 (.5 hrs.) (three conferences), 4/18 (.15 hrs.) and 6/28 (.2 hrs.) were relatively brief and involved the Trustee and one other lawyer in the firm. For the reasons already stated, the time will be allowed. The meetings on 1/6 (.2 hrs.) and a second meeting on 2/27 (.1 hrs.) between two lawyers at the Kittay Firm were brief, and the time will be allowed for the reasons stated.

The participation of three lawyers in a February 22 meeting with Bear Stearns' counsel is a different story. On that day, the Trustee billed 1.75 hours, Michelle G. Gershfeld billed 1.5 hours and Robin Meyer-Konigsberg billed 1.2 hours. They accounted for $1,802.25 in billed time. The Trustee has failed to demonstrate the reasonableness or necessity of allowing three lawyers to participate in this meeting. The Court will disallow $600.00 under the theory that the Trustee may have attended in his

Trustee's capacity, accompanied by one of his lawyers, but the services provided by the
second lawyer were unnecessary.

In addition, on May 30, 2006 and June 22, 2006, the Kittay Firm's attorneys held
multi-lawyer conferences regarding the settlement.  The estate's accountant, Gary R.
Lampert, also attended the May 30th conference, and billed time.  The Kittay Firm's
attorneys billed $999.00 on these two days, and as in the case of the real estate
conferences, $333.00 will be disallowed.

I have considered Bear Stearns' remaining objections, and conclude that they lack
merit.  Furthermore, I have reviewed the application and time records submitted by the
Kittay Firm.  Based on that review, I conclude that the balance of the services not
specifically discussed above were reasonable and necessary.  Accordingly, $7,484.53 of
the fees sought by the Kittay Firm will be disallowed, and the balance of the $70,746.75
request will be allowed under the "lodestar" method.  The Kittay Firm has not sought an
enhancement of that fee.

## C.      Gusrae, Kaplan, Bruno & Nusbaum PLLC (Special Arbitration Counsel)

Special Arbitration Counsel seeks $13,097.50 in fees.  Its services were
reasonable and necessary for the same reason that the Kittay Firm's arbitration-related
services were.  Nevertheless, the majority of its time records fail under the UST
Guidelines.  The principal problem is one of "lumping." [12]  "Lumping" refers to the
practice of aggregating time entries involving two or more discrete tasks without

---

[12]      There are also some mathematical discrepancies.  In some cases, the time charged for a particular
day exceeds the "lodestar," i.e., the time multiplied by the billing rate.  For example, on May 8, 2006, Mr.
Gehn billed 30 minutes at an hourly rate of $350.00, and listed the fee for that service as $350.00 rather
than $175.00.  (See annexed Schedule C-2.)  The discussion that follows assumes that in this and in similar
situations, Special Arbitration Counsel is seeking to recover a fee of $350.00.

identifying the time spent on each task.  "Lumping" makes it difficult to determine if the

timekeeper spent a reasonable amount of time on each discrete task.  As a result, the

timekeeper fails to sustain its burden of proving that its fees are reasonable.  The UST

Guidelines permit "lumping" only where the aggregate time does not exceed 30 minutes.

UST Guidelines, (b)(4)(v).

Schedule C-1 identifies 23 "lumped" time entries.  These entries account for 35.5

hours, $8,150 in fees, and a blended hourly rate of $229.58.  In light of the UST

Guidelines, the Court will limit the compensable time to 30 minutes for each of the

"lumped" entries.  At a blended hourly rate of $229.58, this translates to allowed fees of

$2,640.14.  The balance of the fees attributed to these entries, $5,509.86, will be

disallowed.

Many of the entries identified on Schedule C-1 are also too vague.  They record a

telephone conversation, conference or intra-firm meeting or discussion without disclosing

the subject matter or the other parties, or both.  These vague entries appear in boldface on

Schedule C-1.  These deficiencies provide additional grounds for disallowing the related

fees, but in light of the reduction for "lumping," there will be no further reduction on

account of the vagueness of these entries.  The time records include additional vague

entries set forth on Schedule C-2. These entries account for $2,685.00 of billed time, and

50% will be disallowed.  Finally, Special Arbitration Counsel's records include a one-

hour time entry on January 20, 2006.  The entry refers to a "NASD Conference Call"

involving David A. Ghen, Esq., and a fee of $350.00.  This call occurred more than

month before the effective date of the firm's retention, and fee relating to this call is

disallowed.

Accordingly, $7,202.36 of the time sought is allowed, and the balance is disallowed.

### D.      Reimbursement of Expenses

The Trustee does not seek any reimbursement of expenses.  The Kittay Firm and Special Arbitration Counsel seek a total of $1,450.73.  In light of the fee reductions and the small amount of expenses involved in this request, the expenses are allowed.  The Trustee is directed to submit an order consistent with this decision.

Dated: New York, New York
       June 12, 2007

                              /s/  *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                        Chief United States Bankruptcy Judge